# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

OZGUR CAN LEONARD,

          Petitioner,

vs.

RACHEL JOY LENTZ,

          Respondent.

No. 17-CV-3037-CJW

**ORDER**

---

## TABLE OF CONTENTS

I.  Background ...................................................................................... 2

II.  Applicable Law ............................................................................... 4

III.  Discussion ...................................................................................... 4

  A.  Subject Matter Jurisdiction and Exercise of Custody Rights ......................... 5

    1.  Exercise of Custody Rights ............................................................ 5

    2.  Subject Matter Jurisdiction .......................................................... 16

  B.  Alleged Factual Errors and Respondent's Ability to Travel to Turkey ........... 18

  C.  Affirmative Defense Burden of Proof ................................................. 20

  D.  Alternative Remedies or Undertakings ................................................ 23

IV.  Conclusion..................................................................................... 26

This matter is before the Court on Ozcur Can Leonard's ("petitioner") Motion to Alter or Amend Judgment under Federal Rule of Civil Procedure 59(e). (Doc. 92). Rachel Joy Lentz ("respondent") timely filed a resistance (Doc. 93), and petitioner timely filed a reply (Doc. 94). For the following reasons, petitioner's motion is **granted in part and denied in part**.

## I.    BACKGROUND

This Court previously engaged in a lengthy discussion of the factual history of this case and will not repeat that discussion here. *Leonard v. Lentz*, ___ F. Supp.3d ___, No. 17-CV-3037-CJW, 2017 WL 6887535, at *1-4 (N.D. Iowa Nov. 1, 2017). Instead, the Court will provide an abbreviated discussion of the relevant facts. Petitioner and respondent married in Turkey and had three children together, all of whom were born in Turkey. Petitioner has dual citizenship with Turkey and the United States while respondent has only American citizenship. The three children—I.Y.L, S.M.L., and E.M.L.—are all dual citizens of both the United States and Turkey. Petitioner and respondent are presently engaged in divorce proceedings in Turkey, though they remain legally married.

The Turkish Family Court issued a *ne exeat* order providing that the children were not to be taken out of Turkey without the petitioner's consent. The day after the order was issued, respondent, the children's mother, brought the three children to Iowa to pursue medical treatment for E.M.L., who was born with end-stage renal disease. Petitioner asserted that the children were brought to Iowa without his knowledge or consent in violation of his custody rights and brought a petition under the Hague Convention to have the children returned to Turkey, the children's country of habitual

residence.  Respondent argues that she had no knowledge of the *ne exeat* order prior to removing the children from Turkey.[1]

The Hague Convention applies to this case.  The Court previously found that E.M.L. required a kidney transplant, which had not taken place at the time the Court entered its previous Order and, based on the evidence presented, that petitioner did not meet his burden of proof in establishing a prima facie case.  *Leonard*, 2017 WL 6887535.  The Court, proceeding in its analysis, further determined that the grave risk affirmative defense set forth in Article 13(b) of the Hague Convention[2] also applied.  Thus, even if petitioner had presented a prima facie case, the Court found it was not appropriate to order that E.M.L. be returned to Turkey.  *See* Hague Convention art. 13 (providing that a court "is not bound to order the return of the child if the person . . . wh[o] opposes its return establishes that [an affirmative defense applies]").

Finally, having found that E.M.L. should not be returned to Turkey, the Court determined that its refusal to separate the children by returning I.Y.L. and S.M.L. to Turkey best served the spirit and text of the Convention.  In his Motion to Alter or Amend Judgment, petitioner does not ask the Court to reconsider this portion of its ruling.

Based on subsequent pleadings by the parties, the Court understands that E.M.L. has since received a kidney transplant at the University of Iowa Health Care system ("UIHC"), and that the transplant was successful.  (Docs. 92, at 2; 93, at 6 n. 2).  The

---

[1] Although the Court acknowledges that there is no evidence to the contrary, the Court has thus far not issued a finding on whether respondent had knowledge of the *ne exeat* order at the time she removed the children from Turkey, nor does the Court presently issue a finding on this issue.

[2] Article 13(b) reads:
> [T]he judicial or administrative authority of the requested State is not bound to order the return of the child if the person . . . [who] opposes its return establishes that . . . there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.

Court previously received evidence, however, that E.M.L. would need to remain in close proximity to the UIHC, where the surgery was conducted, for approximately twelve months post-transplant to ensure E.M.L.'s speedy and full recovery. The Court has not received any additional evidence disputing that E.M.L. needs to remain in close proximity to UIHC during E.M.L.'s recovery.

## II. APPLICABLE LAW

"The [United States] Supreme Court has noted that [Federal Rule of Civil Procedure] 59(e) was adopted 'to mak[e] clear that the district court possesses the power to rectify its own mistakes in the period immediately following the entry of judgment.'" *Norman v. Ark. Dept. of Ed.*, 79 F.3d 748, 750 (8th Cir. 1996) (citations omitted) (second alteration in original). Relief under Rule 59(e) "is generally available only when a manifest error affects the 'correctness of the judgment.'" *Id.* Upon review under a Rule 59(e) motion, a court should limit its review to correcting "manifest errors of law or fact or to [considering] newly discovered evidence." *Hagerman v. Yukon Energy Corp.*, 839 F.2d 407, 414 (8th Cir. 1988).

## III. DISCUSSION

Petitioner now requests that this Court alter its judgment, arguing that the Court's Order, *Leonard*, 2017 WL 6887535, was clearly erroneous because it: 1) exceeded the Court's subject matter jurisdiction; 2) disregarded precedential authority regarding petitioner's "exercise" of his custodial rights; 3) relied on factual errors; 4) disregarded evidence showing respondent's ability to travel to Turkey; 5) failed to hold respondent to the proper standard with respect to the grave risk affirmative defense; and 6) did not consider alternative methods by which the children could be returned to Turkey. (Doc. 92). Petitioner further asserts that the new evidence of E.M.L.'s successful kidney transplant warrants this Court's reconsideration. (*Id.*). The Court's discussion of the

successful transplant is interwoven with the Court's consideration of the other issues in this Order.

### A.    *Subject Matter Jurisdiction and Exercise of Custody Rights*

Petitioner argues that the Court exceeded its subject matter jurisdiction by ruling on the custody issues underlying the current case. (Doc. 92-1, at 7-8). Specifically, petitioner argues that the Court's definition of "exercise" "attempted to determine whether [p]etitioner exercised the custody rights well or badly, and strayed into the merits of the custody dispute." (*Id.*, at 8 (internal citations and quotation marks omitted)). Petitioner fails, however, to point to those factors the Court considered that crossed the line between consideration of this case under the Hague Convention and consideration of the underlying custody dispute.

### *1.    Exercise of Custody Rights*

In establishing a prima facie case under the Hague Convention, a petitioner must show, by a preponderance of the evidence, that a child's removal or retention from his or her country of habitual residence—here, Turkey—was in violation of the petitioner's custodial rights and that "at the time of removal or retention those rights were actually exercised . . . or would have been so exercised but for the removal or retention." Hague Convention art. 3(b); 22 U.S.C. § 9003(e)(1)(A) (establishing the burden of proof). Thus, the definition of "exercise" may be the turning point for a petitioner attempting to establish a prima facie case and was such a turning point in the instant case.

Importantly, and as previously noted, the law of the children's country of habitual residence must govern the Court's analysis of whether petitioner exercised his custodial rights or would have exercised his custodial rights, had the children not been removed from Turkey. Hague Convention art. 3 ("The removal or retention of a child is to be considered wrongful where—(a) it is in breach of rights of custody attributed to a person . . . *under the law of the State in which the child was habitually resident immediately*

*before the removal or retention . . . .*" (emphasis added)); *Abbott v. Abbott*, 560 U.S. 1 (2010) (determining the petitioner's rights with respect to the law of the child's home country); *Larbie v. Larbie*, 690 F.3d 295, 307 (5th Cir. 2012). Petitioner argues that the Court's reliance on *Larbie* was misplaced and the Court instead should have read further to where *Larbie* states that "[g]enerally, courts 'liberally find' that rights of custody have been exercised unless evidence demonstrates 'acts that constitute clear and unequivocal abandonment of the child.'" 690 F.3d at 307 (citing *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 344-45 (5th Cir. 2004)).

The language of the Hague Convention, however, states that whether a petitioner has exercised his custodial rights is to be determined in accordance with the law of the children's country of habitual residence. This only makes sense. If a petitioner would be found not to have exercised his custodial rights in a court of the children's habitual residence, it would go against the spirit of the Convention to allow petitioner a more liberal standard in American courts. Petitioner would have this Court hold that a court *must* adopt such a liberal standard because, for lack of better phrasing, American courts simply do not know what to do if another country's law is implicated. This goes against years of legal precedent. Fed. R. Civ. P. 44.1 ("In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law."); *Itar-Tass Russian News Agency*, 153 F.3d 82 (2d Cir. 1998) (determining substantive issues of Russian copyright law); *In re Vitamin C Antitrust Litig.*, 810 F. Supp.2d 522 (E.D.N.Y. 2011).

In support of this position, petitioner turns to persuasive authority from the Fifth Circuit Court of Appeals, which indicates that a court is to use caution when presented with difficult legal questions of whether a petitioner has exercised custody rights under the Hague Convention. *See Larbie*, 690 F.3d at 307. Petitioner fails to recognize,

however, that this Court is bound, first and foremost, by the Hague Convention. The Hague Convention states that the threshold issue is whether a petitioner exercised his custody rights under the law of the children's country of habitual residence or would have exercised those rights absent the children's removal. Thus, the Court is not permitted to ignore Turkish law. This, as shown above, would be unjust. It would allow a petitioner to exploit a more liberal standard of "exercise" in the American courts when he would not have been able to prove an exercise of rights in the courts of his children's home country. The intent of the Convention cannot be to allow courts exposure to such manipulation, nor is this Court willing to create precedent permitting such manipulation. Therefore, the Court will not adopt the liberal standard petitioner promotes.

The Court recognizes two sets of rights at issue. First, petitioner asserts that he exercised the rights established by the Turkish Civil Code. Second, petitioner asserts that he exercised the rights bestowed upon him by the *ne exeat* order. The Court will address each in turn.

### a.     *Rights Versus Obligations*

In attempting to assert the violation of certain *rights*, petitioner instead asserted the violation of both *rights* and *obligations*. Petitioner asserted the violation of his *obligation* to make decisions for the care and education of the child, to name the child, to "protect the child's physical, mental, spiritual, moral, and social development," and to be the legal representative of the child. *Leonard*, 2017 WL 6887535, at *7. The Convention does not contemplate the violation of obligations. Hague Convention art. 3 ("The removal or the retention of a child is to be considered wrongful where it is in breach of *rights of custody* attributed to a person . . .." (subdivisions omitted) (emphasis added)). As a result, the Court had to determine whether those *rights* petitioner asserted were violated. That is, the right to withhold consent for the removal of the children from the home, and the right to determine the children's religious education. (*See id.*).

The Fifth Circuit's liberal definition is intended to aid in difficult decisions of whether a petitioner has established the exercise of his rights. *Sealed Appellant*, 394 F.3d at 344 (holding that a court should impose a liberal definition for the sole purpose of avoiding a discussion of the underlying merits of the custody dispute). This case did not present the same difficult set of facts facing the Fifth Circuit Court of Appeals. In determining whether petitioner exercised the custodial rights laid out by the Turkish Civil Code or would have exercised his rights absent the children's removal, the Court turned to the Turkish Civil Code[3] and the facts established by the evidence. In reading the Turkish law presented to the Court—to which there were no objections—the Court concluded that petitioner could not establish that he exercised his rights.[4] This was not

---

[3] Petitioner notes that "[t]his Court has not been presented with any legal authority or evidence that it could have relied on in making . . . determination[s] of foreign law." (Doc. 92-1, at 4 n. 5). To the contrary, the Court relied on the plain language of the Turkish Civil Code sections that petitioner offered into evidence. Petitioner cannot now object to the language of the Turkish Civil Code *that he submitted* as being the result of an erroneous translation. Further, as stated in Federal Rule of Civil Procedure 44.1, the interpretation of foreign law is a question of law. Thus, it is for the Court to determine, not the parties.

[4] The Court's reading of the Turkish Civil Code is buttressed by other authorities reaching the same conclusions as the Court:

> The parents meet the cost of the care, education and protection of the child. *This obligation* continues until the child reaches majority. . . . Parents *must* secure and protect the physical, mental, spiritual, moral and societal development of the child.
>
> ....
>
> [The Turkish Civil Code] deals with religious instruction and [religious] education, the determination of which is the absolute right of the parents.
>
> ....
>
> . . . The child cannot permanently leave [the residence of the parent(s) who has/have custody] without the consent of the parents.
>
> ....
>
> When custody is removed, the *obligations* of the parents to contribute to the upbringing and education of the child continue.

the sort of difficult decision contemplated by the Fifth Circuit and, thus, the Court need not adhere to such a liberal standard as that imposed by the Fifth Circuit. Therefore, the Court will not disturb its prior holding as to this issue.

### b.    *Ne Exeat Right*

The Court is also presented with the separate issue of the *ne exeat* order issued by the Turkish Family Court. In its prior ruling, the Court found that the Convention was intended to prevent a parent from removing a child from his home country in order to find a more favorable forum to resolve custody disputes. *See accord Abbott v. Abbott*, 560 U.S. 1 (2010). A parent should not be permitted to violate a *ne exeat* order in search of a more favorable forum. *Id.* at 20-21. In the instant case, however, respondent did not seek to have an American court resolve the issue of custody; thus, the objective to prevent the quest for a more favorable forum is not implicated here. Rather, custody and divorce proceedings remain pending in Turkey. As such, the Court stands firm in its conviction that this situation does not fit squarely within the Convention's attempt to prevent the wrongful removal of children *for the sole purpose* of adjudicating custody matters in a more favorable court.

The Court, however, also recognizes that the Supreme Court has spoken on the issue of *ne exeat* rights. In *Abbott v. Abbott*, Ms. Abbott removed a minor child to Texas from Chile and, upon their arrival in Texas, petitioned a Texas "state court to diminish or eliminate the father's custodial and visitation rights" while custody proceedings were pending before a Chilean court. 560 U.S. at 20-21. That is, quite clearly, not the case here, where neither party has attempted to bring custody proceedings before an American court. This is a key distinction, as the purpose of the Convention may be served where

---

Esın Örücü & Canan Arin, *How Does Turkish Family Law Fare Compared to the Principles of European Family Law Regarding Parental Responsibilities?*, *in* Juxtaposing Legal Systems and the Principles of European Family Law on Parental Responsibilities 252-54, 261 (Jane Mair & Esın Örücü eds., 2010) (emphasis added).

a child's home country is permitted to decide the issue of custody—as here—but the purpose of the Convention may not be served where a parent seeks to deprive the child's home country of the ability to decide the issue of custody—as in *Abbott*. *Id.* ("The Convention is based on the principle that the best interests of the child are well served when decisions regarding custody rights are made in the country of habitual residence."). As such, the Court's prior rationale is not wholly improper in finding that the Convention may still be served by allowing the children to remain in the United States, as long as custody proceedings remain with the Turkish Court. Nevertheless, the *Abbott* Court's holding that a *ne exeat* order creates a right of custody within the meaning of the Convention is relevant to this case. *Id.* at 22 ("[A] parent possessing a *ne exeat* right has a right of custody and may seek a return remedy.").

In broad language, the *Abbott* Court held that a *ne exeat* order creates a custodial right that is violated when the parent against whom the order is issued violates the order:

> [A] *ne exeat* right is by its nature inchoate and so has no operative force except when the other parent seeks to remove the child from the country. If that occurs, the parent can exercise the *ne exeat* right by declining consent to the exit or placing conditions to ensure the move will be in the child's best interests. When one parent removes the child without seeking the *ne exeat* holder's consent, it is an instance where the right would have been "exercised but for the removal or retention." Hague Convention art. 3(b).

*Id.* at 13. Here, petitioner held the kind of *ne exeat* right contemplated by the *Abbott* Court. Indeed, the *ne exeat* order clearly states that the children were not to be removed from Turkey without petitioner's consent. (Doc. 85-10). Whether respondent was aware of the order at the time she removed the children from Turkey is of no consequence for purposes of determining whether defendant exercised the right created by the *ne exeat* order. The right vested when the order was issued, which appears to have been prior to when respondent and the children exited Turkey. Thus, *Abbott* dictates that a custodial

right was created in petitioner by the *ne exeat* order, and that right was violated when respondent removed the children from Turkey without petitioner's consent.

Although this concession is a narrow one, it is sufficient to find that petitioner did establish a prima facie case under the Hague Convention. *Abbott* dictates that where a petitioner shows a violation of his *ne exeat* rights, the Convention may properly be implicated. 560 U.S. at 13-14 ("The Court of Appeals' conclusion that a breach of a *ne exeat* right does not give rise to a return remedy would render the Convention meaningless in many cases where it is most needed."). Therefore, the Court holds that petitioner has established a prima facie case under the Hague Convention.

Respondent previously raised two affirmative defenses under Article 13: 1) that petitioner consented to, or subsequently acquiesced in, the children's removal from Turkey under Article 13(a), and 2) that Article 13(b)'s grave risk affirmative defense applied. Because the Court has found that petitioner established a prima facie case, both affirmative defenses are once again implicated.[5] The Court previously found, however, that respondent failed to establish the Article 13(a) affirmative defense by a preponderance of the evidence: "Respondent does not argue that petitioner consented to the children's removal, nor does the Court find that a colorable argument in favor of

---

[5] The Court notes that petitioner misconstrues the Court's prior analysis of whether petitioner established a prima facie case. Petitioner erroneously interprets the Court's prima facie analysis as an analysis that improperly shifted the burden of establishing the Article 13(a) affirmative defense from respondent to petitioner. This is incorrect. The factors relevant to establishing a prima facie case may also be relevant to establishing the failure to exercise custodial rights as an Article 13(a) affirmative defense. Here, however, respondent did not claim that petitioner failed to exercise his custodial rights as an Article 13(a) affirmative defense and, thus, the Court did not address this aspect of Article 13. Respondent alleged only that the second part of the Article 13(a) affirmative defense applied, that petitioner had "consented to or subsequently acquiesced in the removal or retention." Hague Convention art. 13(a). Whether petitioner established a prima facie case was addressed with respect to Article 3. As a result, petitioner bore the burden of proving his case by a preponderance of the evidence. 22 U.S.C. 9003(e)(1)(A). It is the overlap in relevant considerations that petitioner mistakes for a legal error.

consent may be found in this case. In addition, the Court is not persuaded that petitioner acquiesced in the children's removal from Turkey." *Leonard*, 2017 WL 6887535, at *12. Respondent presents no reason why the Court should disturb its prior holding that this affirmative defense did not apply, and the Court sees no reason to disturb this rationale *sua sponte*. The Court has thus far determined that petitioner established a prima facie case and that respondent failed to establish that the Article 13(a) affirmative defense set forth applied. As will be shown *infra*, the Court maintains that the grave risk affirmative defense applied.

Generally, a court's review under Federal Rule of Civil Procedure 59(e) should be limited to reconsidering those manifest errors that affect the "correctness of the judgment." *Norman*, 79 F.3d at 750 (citation and internal quotation marks omitted) (holding that where a district court dismissed a case based on an erroneous factual finding, it was not an abuse of discretion to deny review under Rule 59(e) if the court could have taken the same action even absent the court's error). The Court finds that petitioner's opportunity to establish a prima facie case is so fundamental, however, that it is proper, in this case, to reconsider the Court's prior findings with respect to petitioner's prima facie case, even though the Court's ultimate decision remains unmodified.

*Abbott*, having issued from the United States Supreme Court, is binding precedent. Although the Court respectfully disagrees with the broad holding in *Abbott*, as will be explained *infra*, the Court also recognizes that the appellate structure of the United States Judiciary mandates that this Court follow the broad precedent set by the *Abbott* Court. Under *Abbott*, the Court must find that petitioner did exercise one custodial right—the right to withhold consent for respondent to remove the children from Turkey under the *ne exeat* order. The Court emphasizes, however, that the only part of its prior Order that the Court now reverses deals with whether petitioner exercised the right granted by the *ne exeat* order; this order does not disturb the Court's previous finding that petitioner did

not exercise the remaining rights previously enumerated. *Leonard*, 2017 WL 6887535, at *6-10.

### c.     *Abbott v. Abbott*

The *Abbott* Court determined that a *ne exeat* right is a right of custody within the meaning of the Convention. The Supreme Court further found that "[e]ven a *ne exeat* order issued to protect a court's jurisdiction pending issuance of further decrees is consistent with allowing a parent to object to the child's removal from the country." 560 U.S. at 14. Respectfully, I disagree with the Court's sweeping conclusion. *Ne exeat* rights, such as the one presented in the instant case, can more properly be characterized as a parent's right to continue to litigate proceedings in the country issuing the *ne exeat* right. In other words, a *ne exeat* right is not intended to create a right to object to the removal of children; it is a right intended to object to the removal of *jurisdiction* from one court to another. I shall explain further.

The distinction between a right to prevent the removal of a child from a jurisdiction and the right to prevent the removal of legal jurisdiction is a fine, but important, one. The intent of the Convention is to allow the child's home country to fully litigate custody proceedings and to prevent a parent who wrongfully removes a child from doing so in an attempt to find a friendlier forum to litigate custody disputes. *Abbott*, 560 U.S. at 20-21; *Silverman v. Silverman*, 267 F.3d 788, 791-92 (8th Cir. 2001). Although a *ne exeat* order itself creates the right to object to the removal of a child from a jurisdiction, where a right to object to the removal of a child from a jurisdiction exists independent of a *ne exeat* order, it would be duplicative for a court to issue such an order for the sole purpose of allowing a parent to object to the child's removal. Therefore, one purpose of a *ne exeat* order may be reiterating the pre-existing right to object to removal of a child, but this is not necessarily the *only* purpose.

13

Article 339 of the Turkish Civil Code creates a right for a parent to prevent a child's removal from the house and further provides that a child cannot be taken away without a legal reason. This right extends to allow a parent to withhold consent for a child to be removed from Turkey. Mert Yalçın, *Family Law in Turkey: Overview*, THOMSON REUTERS (Oct. 1, 2017), https://uk.practicallaw.thomsonreuters.com/6-616-4228?transitionType=Default&contextData=(sc.Default)&firstPage=true#co_anchor_a 944764 (Even absent a *ne exeat* order, "to move the child out of the jurisdiction without the consent of the other party is not allowed."). Thus, the Turkish Family Court did not need to issue the *ne exeat* order to allow petitioner to object to the children's removal from the country because petitioner already held this right.

When viewed in full context, it becomes apparent that the Turkish court issued the *ne exeat* order to protect its jurisdiction over the pending custody dispute. During the evidentiary hearing, this Court received expert testimony that Turkish law provides no mechanism by which I.Y.L., S.M.L., and E.M.L. may be ordered returned to Turkey now that they have been taken from Turkey; thus, the Turkish court is without the ability to order the children back to the confines of its jurisdiction. A Hague petition brought in this Court is the only mechanism that would force the children's return.

Turkey does, however, have a mechanism for ordering the children to remain within its jurisdiction prior to the children's removal. That mechanism is the *ne exeat* order. Turkish authorities are without jurisdiction to enforce custody orders when the parties involved are on American soil. As a result, to protect its ability to enforce a final judgment, the Turkish Family Court had to act proactively to prevent the children from being removed from Turkey. The Turkish Family Court did so in issuing the *ne exeat* order. The parties agree that the Turkish court has essentially stayed its proceedings pending the resolution of this case. The Turkish Family Court's inclination to delay its own proceedings supports the notion that the *ne exeat* order was intended to protect the

Turkish court's jurisdiction because any order issuing from the Turkish court now would be enforceable only on a contingency basis: if the children are ultimately returned to Turkey, the Turkish Family Court will again have the ability to enforce its own custody order. In the event that the children are ordered not returned, the Turkish authorities would have to rely on American authorities to enforce a Turkish order. This, of course, would place both countries in a precarious position. By proactively issuing the *ne exeat* order, the Turkish court attempted to prevent this very problem from occurring.

The Court recognizes that the Turkish Family Court may have had more than one motivation in issuing the *ne exeat* order. The Court, however, disagrees with *Abbott*'s broad proposition that a *ne exeat* order *always* creates a custody right. This is a possibility, not a certainty. Indeed, where a country—such as Turkey—has a preexisting right to decline to consent to the child's removal from the home, it would be duplicative for a court of that jurisdiction to issue a *ne exeat* order for no purpose other than to restate this right. The logical conclusion, then, is that in at least some circumstances, there must be another purpose for the issuance of such an order. I believe that this is such a situation.

I agree with Justice Stevens' observations in *Abbott*:

> [T]he Court has now decreed that whenever an award of visitation rights triggers a statutory default travel restriction provision, or is accompanied by a travel restriction by judicial order, a parent possess[es] a right of custody within the meaning of the Convention. Such a bright-line rule surely will not serve the best interests of the child in many cases. *See* Perez-Vera Report ¶ 25, at 432. It will also have surprising results.

560 U.S. at 38 (Stevens, J., dissenting). The *Abbott* Court cites to a number of cases it urges support the notion that a *ne exeat* right is a right of custody within the meaning of the Convention. 560 U.S. at 16-18. Those cases, however, do not contemplate a situation wherein a judicial order creating a *ne exeat* right would be duplicative of a

preexisting right.[6] Even if a judicially ordered *ne exeat* right would be duplicative in the countries issuing the cited cases, the courts of those countries did not discuss the significance of the preexistence of the right. The absence of a discussion on such duplicity could be irrelevant, but without an indication of such irrelevance, this absence cannot be written off as inconsequential.

Perhaps the Turkish Family Court did wish to emphasize petitioner's preexisting right; however, it is more likely that the Turkish court intended to protect its own jurisdiction. In any case, petitioner has not shown by a preponderance of the evidence that the *ne exeat* order was intended to establish a custodial right as opposed to protect the Turkish court's jurisdiction and ability to enforce a judgment. The Court remains unpersuaded that this *ne exeat* order was, in fact, intended to create a custodial right within the meaning of the Convention and, if not for *Abbott*, the Court would maintain that petitioner failed to establish a prima facie case under the Hague Convention. Put simply, I find the *Abbott* Court's holding to be too broad. *Accord Abbott*, 560 U.S. at 37-38, 47 (Stevens, J., dissenting) ("[T]he bright-line rule the Court adopts today is particularly unwise in the context of a treaty intended to govern disputes affecting the welfare of children.").

## 2. Subject Matter Jurisdiction

Turning now to the question of whether the Court overstepped its subject matter jurisdiction in considering the merits of the custody dispute, the Court maintains that its prior ruling was within its subject matter jurisdiction. "The determination whether a party is exercising custody rights closely parallels the determination of the nature and

---

[6] Although the Court was not able to obtain official English translations of *Foxman v. Foxman*, Oberster Gerichtshof [O.G.H.], Bundesverfassungsgericht [BVerfG], *Public Ministry v. M.B.*, and *Attorney for the Republic at Perigueux v. Mrs. S.*, as cited in *Abbott*, this statement holds true for those cases the Court was able to obtain.

dimension of those rights." *Sealed Appellant*, 394 F.3d 344. This Court agrees that it must not cross the line into addressing the underlying custody dispute—those issues are within the sole province of the Turkish courts. *See id.* As the Fifth Circuit has recognized, this is a fine line and courts must tread carefully when nearing it. *Id.* This Court did not cross the fine line between the exercise of rights and the issue of custody.

Petitioner offers no support for his assertion that the Court's holding went beyond its subject matter jurisdiction. Instead, petitioner offers conclusory assertions:

> This Court's opinions in this Order have considered evidence relevant to custody, matters beyond the subject matter jurisdiction of the federal courts, and in its stringent investigation of "exercise" has attempted to determine whether [p]etitioner exercised the custody rights well or badly, and straying [sic] into the merits of the custody dispute.

(Doc. 92-1, at 8). Without a starting point from which to reconsider its previous Order from petitioner's point of view, the Court is without assistance in revisiting its prior ruling. Petitioner also neglects to note that many factors relevant to this Court's analysis under the Hague Convention may also be relevant to the Turkish courts in determining custody. This Court did not consider those factors for the purpose of determining custody. This Court considered those factors for the purpose of determining whether petitioner exercised (or would have exercised) his existing custody rights.

Whether petitioner exercised his custody rights well or not is of no concern to this Court—the Court stopped its analysis upon determining that petitioner did not exercise his custodial rights. Petitioner seems to equate this determination with a determination that petitioner exercised his rights poorly and, thus, the Court ruled against petitioner. This is incorrect. Although many factors relevant to its own analysis may also prove relevant to the Turkish courts, this Court considered those factors for a different purpose and in a purely legal manner. The Court did not pass judgment on whether petitioner

exercised his rights well or poorly and, without some assistance from petitioner, is unable to determine petitioner's reasoning for thinking otherwise.

### B.     Alleged Factual Errors and Respondent's Ability to Travel to Turkey

Petitioner argues that the Court "omitted all of Respondent's actions in the run-up to her wrongful removal of the children" and lists conduct that petitioner alleges was wrongful. (Doc. 92-1, at 6). Petitioner argues the Court "has ignored all of these facts for which Petitioner has provided clear evidence, clearly pointing to Respondent's lack of credibility and attempts to alienate Petitioner from his children . . . ." (*Id.*).

Petitioner correctly notes that "an abuse of discretion may occur when a court fails to consider a relevant factor that should have received significant weight." *United States v. Haack*, 403 F.3d 997, 1004 (8th Cir. 2005). Petitioner's assertion that the Court failed to consider such a relevant factor, however, misses the mark. Petitioner and respondent presented the Court with different accounts of the events leading up to the children's removal to the United States. Those accounts varied in many ways and the Court was thus tasked with reconciling those differing factual accounts. Such is the prerogative and responsibility of a district court. *United States v. Scott*, 485 F.2d 576, 577 (8th Cir. 1973) ("Determinations of credibility rest with the trier of fact and not with the appellate court."). As the Court previously articulated:

> An appellate court is not positioned as well as a trial court to decide issues of fact and, specifically, questions of credibility, because appellate courts review only transcripts which frequently cannot reveal a witness's demeanor. *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003). Thus, "[trial] court findings of fact are to be accorded the presumption of correctness." *Wainwright v. Witt*, 469 U.S. 412, 428 (1984).

*Leonard*, 2017 WL 6887535, at *19 n.14. Petitioner mistakes the Court's reconciliation of factual disputes for a failure to consider much of petitioner's evidence. (*See* Doc. 92-

1, at 6 (providing the numerous ways in which petitioner claims the Court committed factual error)).

Moreover, petitioner and respondent each presented evidence regarding their underlying marital issues. Much of this evidence was irrelevant to the narrow issues before the Court. Petitioner himself acknowledges that he "is not required to demonstrate that Respondent has denied him access to the children in order to demonstrate 'wrongful removal' or 'wrongful detention' . . .." (Doc. 92-1, at 7). The Court has no obligation to resolve disputes on facts irrelevant to the Court's analysis and, thus, refrained from commenting on the parties' underlying domestic relations.

In any event, the evidence presented did not establish that respondent refused to allow petitioner access to the children. Rather, the evidence showed that respondent was willing to allow petitioner to exercise visitation with the children—and to a degree even encouraged petitioner's presence in the children's lives—but set certain parameters on petitioner's visitation, in what respondent believed to be in the best interests of the children. The Court declines to overturn its ruling on the basis that the Court failed to consider respondent's refusal to allow petitioner access to the children because, put simply, the Court did consider evidence purportedly showing that respondent isolated the children from petitioner. In considering the evidence, the Court had to reconcile competing versions of events. In doing so, the Court found that petitioner's failure to exercise his custodial rights was through his own fault. As such, the Court stands by its ruling.

Petitioner further asserts that the Court should overturn its previous ruling that respondent may not be able to enter Turkey because of a visa ban that was imposed on October 8, 2017. This point is now moot, however, and the Court need not revisit it. Whether respondent would be able to enter Turkey was considered with respect to E.M.L.'s ability to receive a kidney transplant in Turkey. *Leonard*, 2017 WL 6887535,

at *15.  Although respondent's ability to enter Turkey may be relevant to other issues, the Court limited its discussion to whether respondent would be able to serve as a kidney donor in Turkey.[7]  The parties agree that E.M.L. has received a kidney transplant. (Docs. 92, at 2; 93, at 6 n. 2).  As a result, respondent's ability to travel to Turkey to serve as a kidney donor is no longer relevant.[8]  The Court recognizes that respondent's ability to travel to Turkey may be relevant to other issues, but the parties did not previously argue or present evidence on those issues.  The Court did not consider those issues *sua sponte* and, therefore, it would be inappropriate for the Court to visit those issues in the first instance on a motion to alter or amend judgment.

### C.  *Affirmative Defense Burden of Proof*

A respondent must establish an Article 13(b) grave risk defense by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A).  Petitioner contends that the Court shifted the burden of proof to petitioner and required petitioner to prove "that the medical facilities in Turkey are not inadequate, to the standard of 'certainty.'"  (Doc. 92-1, at 14 (emphasis removed)).  Petitioner is mistaken.  The Court did not shift the burden to

---

[7] The Court previously found that respondent was a suitable donor for E.M.L. and that petitioner had not been tested as a donor, nor had he begun the process of being evaluated as a donor. Aside from respondent, no other suitable donor had been found as of the time of the Court's previous ruling.  Thus, respondent's ability to serve as a donor was of paramount importance and, consequently, if respondent could not travel to Turkey to serve as a kidney donor, E.M.L. would face a grave risk if returned to Turkey because E.M.L. could be separated from the only known viable donor.

[8] The Court notes that on November 8 and 9, 2017, the Turkish Embassy announced that it would begin processing visa applications from United States citizens on a "limited basis."  This was only a partial lift on the previously imposed visa ban, however.  *Statement from the Embassy of Turkey in Washington, DC* (Nov. 9, 2017), http://washington.emb.mfa.gov.tr/Mission/ShowAnnouncement/336796.  Importantly, as the Court stated before, Turkey may alter its foreign policy decisions at any time, and this Court refuses to involve itself in the policymaking decisions of another sovereign.  Therefore, even if respondent were able to obtain a visa on any given day, there is no guarantee that she would be able to obtain a visa when she actually needed it.

petitioner as an initial matter. Rather, upon finding that respondent made the requisite showing by clear and convincing evidence, the Court permitted petitioner an opportunity to rebut the evidence presented. Petitioner presented none and, thus, the Court's conclusion that respondent met her burden by clear and convincing evidence was a sound one.

Petitioner seems to believe that he was entitled to a conclusive presumption that E.M.L. could receive a kidney transplant in Turkey because E.M.L. previously received care in Turkey. This is incorrect. Even though E.M.L. did receive care in Turkey previously, this does not mean that E.M.L. could receive a *transplant* and necessary follow up care in Turkey. Where respondent met her burden of proving that E.M.L. could not receive a transplant in Turkey and petitioner presented no evidence to the contrary, the Court had no factual basis upon which to rule in petitioner's favor.

In any case, E.M.L. has received a transplant and whether E.M.L. can obtain a kidney transplant in Turkey is now moot. Nonetheless, the Court feels it appropriate to clarify an important point that both petitioner and respondent appear to have misinterpreted. The Court did not pass judgment on the standard of care Turkish medical facilities are able to provide, nor would the Court pass judgment on Turkish medical facilities. The issue presented to the Court was a legal one. Where respondent showed by clear and convincing evidence that Turkish facilities could not perform a successful kidney transplant on an infant of E.M.L.'s size, and petitioner failed to present any evidence to rebut respondent's evidence, the Court was unable to find that Turkish facilities could perform the transplant. As stated previously, "while it is entirely possible that E.M.L. could receive exceptional care in Turkey, the Court is simply precluded from finding E.M.L. could receive *any* care in Turkey because the Court has not been presented with any evidence on the matter." *Leonard*, 2017 WL 6887535, at *13 (emphasis in original).

The issue of whether E.M.L. could be returned to Turkey post-transplant is not moot. The Court previously entertained the issue of E.M.L.'s post-transplant recovery and found that E.M.L. needed to remain in close proximity to UIHC for the duration of her recovery. Petitioner does not request that the Court return the children to Turkey immediately. Without conceding that E.M.L. needs to remain near UIHC, petitioner requests that the Court "order the return of the [c]hildren contingent on a future medical 'release' by [E.M.L.'s nephrologist], stating [E.M.L.'s nephrologist] is satisfied that E.M.L.'s further care can be provided in Turkey." (Doc. 92-1, at 17-18). This issue is not ripe for consideration. "Ripeness is peculiarly a question of timing. [I]ts basic rationale is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 579 (1985) (alteration in original) (internal citations and quotation marks omitted). There is no evidence before the Court that E.M.L. has reached the point in her recovery where E.M.L.'s medical team is prepared to "release" E.M.L. Indeed, there is no evidence that such a "release" has been offered, nor is there any evidence indicating when E.M.L.'s medical team will be prepared to "release" E.M.L., if ever.

Expert testimony at the hearing indicated that complications from kidney transplants are not uncommon. There is no evidence before the Court establishing what care E.M.L. could receive in Turkey and at what point it would be safe post-transplant for E.M.L. to return to Turkey. This Court simply lacks a factual basis in the evidence presented at the hearing to determine when or if it would be safe for E.M.L. to return to Turkey. Petitioner would have this Court issue an order that presumably would place the burden on E.M.L.'s medical team to make this factual determination. That is not their role and should not be their burden. The Court ruled, based on the evidence before it at the hearing, that returning E.M.L. to Turkey at that time would be a grave risk to her health. Even though E.M.L. has now received a transplant, the issue of E.M.L.'s

follow-up care remains. Until such time as concrete evidence actually exists, or is capable of being offered, to show that E.M.L. may safely be returned to Turkey, it would be premature for the Court to rule on this issue. The fact that she has now received a transplant does not demonstrate that the Court's holding was in error. This is not to preclude petitioner from filing a petition at a future date to seek return of the children upon changed circumstances. A court could then consider new evidence of E.M.L.'s condition and necessary treatment and determine whether respondent is still able to establish the affirmative grave risk offense.[9]

### D. Alternative Remedies or Undertakings

The final issue the Court must consider is whether an alternative remedy or undertaking exists that would allow the Court to return the children to Turkey while minimizing or eliminating the grave risk of harm to E.M.L. *Gaudin v. Remis*, 415 F.3d 1028, 1035 (9th Cir. 2005). Petitioner argues that a court finding that a grave risk of harm does exist must go on to determine whether such an alternative remedy or undertaking exists and that this Court erred in failing to do so. (Doc. 92-1, at 15-17). Petitioner's assertion presents two questions: 1) whether a court *must* explore alternative

---

[9]     Under the doctrine of res judicata, a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action. Under the doctrine of collateral estoppel, on the other hand, the second action is upon a different cause of action and the judgment in the prior suit precludes relitigation of issues actually litigated and necessary to the outcome of the first action.

*Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326 n. 5 (1979). When an issue is not ripe, it cannot be litigated and, therefore, a court cannot issue a judgment on the merits of that issue. Whether E.M.L. may be returned under the Hague Convention upon her medical condition improving is a prospective issue and, therefore, one that cannot be litigated. The Court's judgment today, and the Court's judgment previously, *Leonard*, 2017 WL 6887535, considered only those issues that had presently accrued. Whether the children may be returned under the Hague Convention in the future upon changed circumstances necessarily relies on an issue that is not ripe and upon which the Court may not rule.

remedies or undertakings prior to declining to return a child under Article 13(b); and 2) whether an alternative remedy or undertaking existed at the time of the Court's prior Order that would have permitted the Court to return the children while minimizing or eliminating the grave risk of harm to E.M.L. Petitioner does not argue that the Court should have considered such alternatives with respect to I.Y.L. and S.M.L. or that the Court should now consider whether such alternatives exist. Petitioner's argument is solely retrospective, focusing on what petitioner believes to be a *past* error, and does not seek to have the Court consider whether such an alternative exists *prospectively*. Of the two questions petitioner presents, the Court need only reach the second.

   As an initial matter, petitioner's contention that the Court did not consider alternative remedies is in error. First, neither party presented evidence nor argued that an alternative remedy existed that would permit the Court to return the children to Turkey while minimizing or eliminating the risk of harm to E.M.L. Second, the alternatives petitioner now proposes were inherently considered in the Court's prior analysis and the Court did not think an alternative remedy was a realistic possibility in this case. Petitioner presents three alternatives that he now argues the Court should have considered.

   First, petitioner states that the Court could have "require[d] [p]etitioner to undertake to have arranged for a peritoneal dialysis setup and g-tube feeding pump and any other medical arrangements to be in place as a precondition for ordering E.M.L. to be returned." (Doc. 92-1, at 16). The Court inherently considered this possibility in considering whether E.M.L. would face a grave risk in being returned to Turkey. In finding that E.M.L. required a kidney transplant, the Court concluded, based on the medical evidence presented, that continuing dialysis treatment indefinitely for E.M.L. was not a viable option in light of the complications such a treatment plan could present. The Court previously concluded that if the Court were to order E.M.L. returned to Turkey with the idea of E.M.L. receiving a transplant in Turkey, E.M.L. would face a

grave risk for a variety of reasons that will not be recounted here yet again. Thus, requiring petitioner to procure a dialysis treatment plan prior to E.M.L.'s return would not have eliminated the grave risk posed by E.M.L.'s need for a transplant.

Petitioner next argues that the Court could have ordered E.M.L. returned to Turkey conditional on respondent receiving a Turkish visa. Although this would have resolved the issue of E.M.L.'s kidney donor not being available in Turkey, the issue of whether the Turkish medical facilities were equipped to perform E.M.L.'s kidney transplant would have remained. As shown previously, respondent established by clear and convincing evidence that the facilities were not capable of performing the transplant and petitioner offered no evidence to the contrary. Further, this solution would not have resolved the issue of the transplant taking place further in the future as a result of respondent and E.M.L. likely needing to undergo additional testing prior to the transplant, at the request of the facility performing the surgeries. Therefore, the Court previously considered this option and found that it would not eliminate or minimize the grave risk of harm sufficient to return E.M.L. to Turkey.

Having previously considered a plethora of alternatives that would allow the Court to return the children to Turkey, the Court found all such alternatives inadequate. Although the issue is now moot, in the spirit of thoroughness, the Court found it appropriate to address petitioner's arguments. The only solution petitioner proposes that is not moot is the issuance of an order requiring the children to be returned once E.M.L.'s medical team has "released" E.M.L. from their care. This issue was discussed *supra* and is not ripe. The Court sees no other realistic possibility for ordering the children's return to Turkey presently, nor do the parties contend that any other realistic solution exists. As such, the Court did not err in this respect previously, nor is it improper for the Court to decline to return the children in light of the new evidence of E.M.L.'s successful transplant.

## IV.    CONCLUSION

For the foregoing reasons, the Court **declines** to amend or alter its previous judgment.  The Court alters the analysis contained in the previous Order, *Leonard*, 2017 WL 6887535, only to the extent the Court previously found petitioner did not establish a prima facie case.  The children—I.Y.L., S.M.L., and E.M.L.—are ordered **not returned** to Turkey.

**IT IS SO ORDERED** this 18th day of January, 2018.

_____

C.J. Williams
Chief United States Magistrate Judge
Northern District of Iowa